# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 18-62713-CIV-ALTMAN/Hunt

**RYAN WALKER,**

    *Plaintiff,*

*v.*

**UNITED PARCEL SERVICE, INC.,**

    *Defendant.*

_____/

## <u>ORDER</u>

After UPS demoted him, Ryan Walker (our Plaintiff) stopped coming to work. While he was away, he asked UPS for medical leave. UPS's third-party benefits administrator (Aetna) responded by asking Walker to verify—with medical records—his claimed medical condition. After several such requests went unanswered, Aetna insisted. When Walker submitted a one-page doctor's note, Aetna denied his request for leave. By this point, Walker had taken six weeks of leave already. No problem, UPS told him—just come back to work. Five weeks later, though, Walker—still home—asked for *more* medical leave. But he didn't submit any supporting records with this request, either. Two *months* later—by which point Walker had been absent from work for five months, including 14 weeks in 2017 alone—UPS asked Walker (again) to support his request with some medical documentation. Walker didn't submit any and (finally) UPS fired him. Displeased, Walker filed this lawsuit, in which he accuses UPS of violating his rights under the Family Medical Leave Act ("FMLA").

Because the FMLA doesn't protect Walker's interest in staying home indefinitely and without *any* supporting documentation, Walker's Motion for Summary Judgment [ECF No. 54] is **DENIED** and UPS's Motion for Summary Judgment [ECF No. 52] is **GRANTED**.

THE FACTS

The Plaintiff, Ryan Walker, began working for the Defendant, United Parcel Service, Inc. ("UPS"), in 1996. *See* Joint Statement of Facts ("JSOF") [ECF No. 57] ¶ 6. On November 10, 2016, UPS demoted Walker from his position as a "Business Manager" at its Fort Lauderdale center to a new (lower) position at its Hialeah center. *Id.* ¶ 7. Although UPS instructed Walker to report to Hialeah on November 14, 2016, he never showed up. *Id.* Instead, he filed a claim for short-term disability benefits. *Id.* ¶ 13.[1]

Before getting into the details of this story, we first need to know a little bit about how UPS administered benefits claims in 2016 and 2017. In a nutshell, back in 2016, UPS used a bifurcated system for handling employee benefits. *Id.* ¶ 11. While it contracted with Aetna Life Insurance Company to handle short- and long-term benefits programs, it kept the administration of FMLA claims in-house at its Human Resource Service Center (the "HRSC")—a centralized, nationwide HR office in Kansas. *Id.* ¶¶ 2, 12. On January 1, 2017, UPS transferred responsibility for FMLA claims administration from the HRSC to Aetna and, from then on, "no UPS employee had any further involvement in processing FMLA leave requests[.]" *Id.* ¶ 29. Thus, in 2017, Aetna handled all claims for disability *and* FMLA leave. But HR personnel at UPS still "deal[t] with day-to-day issues unique to employees in a particular geographic region." *Id.* ¶ 4. As relevant here, the South Florida geographic region included (in decreasing order of authority): (1) HR Director Rick Corral, (2) HR Operations Manager Raul Simons; and (3) Area HR Manager Olivera Luna-Aloisio. *Id.* ¶¶ 5, 9. In January 2017, Harry Wilson replaced Corral as the HR Director. *Id.* ¶ 9.

---

[1] Walker claimed to suffer from severe major depression, severe generalized anxiety disorder, and moderate "brief PTSD." Walker Sealed Exhibits [ECF No. 70-1] at 4. Later, Walker was the victim of a December 12, 2016 home invasion in which "he was severely beaten and hospitalized due to serious and incapacitating injuries to his head, chest, teeth, and eyes." Amended Compl. [ECF No. 12] ¶ 12.

Returning to Walker's story. As we've said, "shortly after" November 10, 2016, he filed a claim for "Short Term Disability" ("STD") with Aetna (the "2016 STD Application"). *Id.* ¶¶ 13, 15. In it, he listed only one healthcare provider—Dr. Aldo Alamo. *See* Defendant's Statement of Facts ("Def. SOF") [ECF No. 53] ¶ 23;[2] Defendant's Reply Statement of Facts [ECF No. 73] at 3 n.1 (noting that Walker failed to dispute the proposition that he had listed only Dr. Alamo on his initial application for STD benefits). When Aetna received Walker's STD Application, it informed the HRSC, which opened a concurrent application for FMLA leave on Walker's behalf (the "2016 FMLA application"). JSOF ¶ 14.

Both Aetna and the HRSC sent Walker information about the FMLA. Aetna's package advised Walker that "FMLA is separate from disability" and instructed him to "please call the Human Resource Service Center (HRSC) for any questions regarding FMLA." *Id.* ¶ 15. Likewise, UPS (through the HRSC) sent Walker a notice on November 16, 2016, which included the following admonition: "Because you must submit medical documentation in connection with your disability application to Aetna, UPS will not require you to submit independent medical certification for purposes of securing FMLA leave at this time. **If your disability benefits are subsequently denied or terminated by Aetna, the HRSC will send you a letter advising you of your options**." *Id.* ¶ 16 (emphasis added). The HRSC conditionally approved Walker's FMLA leave until November 28, 2016, with the understanding that Aetna would adjudicate his STD claim by then. *Id.* ¶ 19.

Aetna's processing of Walker's STD claim soon hit a brick wall. *Id.* ¶ 20. Aetna requested medical information from Dr. Alamo three times (once by phone and twice via fax)—all unanswered.

---

[2] The Court will cite to the Def. SOF only where Walker has failed to rebut a proposition asserted in that document. S.D. Fla. L.R. 56.1(b) ("All material facts set forth in the movant's statement filed and supported as required above will be deemed admitted unless controverted by the opposing party's statement provided that the Court finds that the movant's statement is supported by evidence in the record.").

*Id.* ¶¶ 20–21; Def. SOF ¶¶ 23–24. Given the lack of documentary support, Aetna suspended Walker's STD claim on November 29, 2016 and gave Walker until December 19, 2016 to submit the requested information. JSOF ¶ 22. As Aetna explained in its notice to Walker:

> [A] claim is suspended when the benefits manager has made 3 attempts and is still unable to obtain sufficient clinical information from your physician(s) to support why you cannot perform your essential job functions. A suspension is Aetna's way of giving you MORE time to submit clinical information in support of your disability. Once a claim is suspended, it becomes your responsibility to make sure that Aetna receives the supporting clinical documentation. The Benefits Manager will no longer pursue clinical information from your physicians.

November 29, 2016 Letter from Aetna to Walker (found in 2016 Aetna File [ECF No. 53-15] at 6). Aetna informed both the HRSC and Walker's managers about the suspension. Def. SOF ¶ 26. But, because Aetna had not yet adjudicated Walker's claim, the HRSC extended Walker's FMLA leave until December 19, 2016. JSOF ¶¶ 23–24.

On December 1, 2016, Walker submitted a one-page "Work/School Status" note from Holy Cross Orthopaedic Institute (dated November 21, 2016), which indicated only that (1) he could return to work on December 6, 2016, and that (2) he could not perform any "heavy lifting, carrying, or pushing." *Id.* ¶ 25. Finding this bare-bones letter insufficient to justify Walker's extended leave request—and because Walker had provided no other information—Aetna denied the 2016 STD Application on December 20, 2016. *Id.* ¶ 26.

With his STD claim denied, Walker took another stab: he sent medical paperwork to Aetna on *both* December 23, 2016 (from Dr. Alan Gregg)[3] and January 6, 2017 (from Jamie Rubin).[4] *See* 2016 Aetna File at 30–31. Aetna responded on January 21, 2017 that "this recent information is not sufficient to warrant a reversal of your disability claim decision at this level" and reminded Walker that

---

[3] Walker's initial visit with Dr. Gregg was on December 22, 2016. *See* Walker Sealed Exhibits at 14.
[4] Walker began seeing Jamie Rubin, a physician's assistant, on December 7, 2016. *See id.* at 7.

"as indicated in that [December 20] letter, you have the right to file a written appeal if you disagree with our decision." *Id.*

After Aetna told UPS on December 20, 2016 that it had denied Walker's STD claim, UPS did two things. *First*, UPS's local Area HR manager (Luna-Aloisio) sent Walker letters on December 21, 2016 and December 29, 2016, directing him to contact Raul Simons (Walker's HR Manager). *See* December 21, 2016 Letter [ECF No. 65-3] at 2; December 29, 2016 Letter [ECF No. 65-3] at 3. Walker testified that he contacted Simons who told him to call Aetna. *See* Walker Dep. at 15 [ECF No. 65-5] at 3 ("[Simons] is the HR – he was the HR manager at the time who I spoke to and he advised me to call Aetna.").

*Second*, the HRSC sent Walker a letter on December 30, 2016—outlining the denial's three consequences. *One*, the letter affirmed that UPS had designated all of Walker's absences—from November 10 to December 30, 2016—as FMLA-protected leave, despite Walker's failure to submit sufficient documentation to Aetna. *See* JSOF ¶ 28; December 30, 2017 Letter (found in HRSC File [ECF No 53-7] at 24). *Two*, the HRSC transferred Walker from FMLA leave to personal leave. *See* JOSF ¶ 27; December 30, 2017 Letter (found in HRSC File at 24). *Three*, the HRSC required Walker, by January 20, 2017, to provide UPS (not Aetna) with a medical note justifying his absence from work. *See* December 30, 2017 Letter (found in HRSC File at 25). The letter also warned Walker: "Please be advised that failure to comply with the instructions in this letter will result in UPS's inability to determine whether you remain out of work for an authorized reason. As a result, your employment could be terminated for being on unauthorized leave." *Id.*

To summarize, then, Walker failed to submit enough documentation to Aetna to justify his 2016 STD claim, which—as a consequence—Aetna denied. Then, UPS's local HR instructed Walker (again) to submit the required documentation to Aetna. When he filed inadequate certifications from Dr. Gregg and Ms. Rubin, Aetna denied his request a second time for lack of specificity. Next, UPS's

national HR (the HRSC) transferred Walker from FMLA leave to personal leave and asked for medical documentation. The HRSC also warned Walker that his failure to provide that documentation—or return to work—could result in his termination. So far so good.

Back to our story. On January 23, 2017, after Walker failed to respond to the HRSC's request for information, the HRSC advised UPS's local HR that Walker was now on an unapproved leave of absence. *See* Email from HRSC (found in HRSC File at 26). Not content to leave Walker in the wind, though, UPS's local HR reached out to Walker *twice* that next week—first over the phone on January 24, 2017, *see* Declaration of Raul Simons ("Simons Decl.") [ECF No 53-12] ¶ 5, and then again by letter dated January 27, 2017, *see* January 27, 2017 Letter (found in Local Records [ECF No. 53-3] at 11).

During that January 24 call, UPS's local HR manager (Simons) told Walker that his leave was now unapproved and that he needed to come back to work. *See* Simons Decl. ¶ 5; January 24 Email from Raul Simons to Olivera Luna-Aloisio (found in Local Records at 10 ("Spoke with Ryan via phone today. I advised him that his leave is now unapproved (Per HRSC EMAIL 1/23/17) and he must report to work immediately[.]")). Walker responded that he wasn't ready to return to work and promised to call Aetna. *See* January 24 Email from Raul Simons to Olivera Luna Aloisio (found in Local Records at 10 ("He told me that he was not ready to return and will call Aetna today. Please check later today or Wednesday to see if his status has changed.")).[5]

---

[5]     Although Walker disputes this construction of the phone call, he cites no evidence for his position that he "was not advised by Raul Simons that his leave was unapproved." Plaintiff's Statement of Material Facts ("Pl. SOF") [ECF No. 68] ¶ 11. So, for instance, Walker references two pages of his own deposition—neither of which mentions the January 24 call at all. *First*, he cites to "Walker Depo at 56:18–57:14" for the proposition that "Mr. Walker was not advised by Raul Simons that his leave was unapproved and that he must report to work immediately." Pl. SOF ¶ 11. But a review of that portion of the transcript reveals nothing about what Walker and *Simons* talked about; rather, it details a conversation between Walker and "Felecia," an Aetna employee. The only part of Walker's deposition (at least the portions of his deposition that are in the record) that references a conversation

When UPS didn't hear back from Walker, another local HR manager—Luna-Aloisio—mailed him a letter on January 27, 2017, warning him that, "[a]lthough you contacted the HRSC and requested FMLA-protected leave, to date, you have not provided the required medical certification to support your absence. . . . Please provide the required medical certification to HRSC to support your absence from work in a timely manner. Failure to do so may result in disciplinary action up to and including termination of employment." January 27, 2017 Letter (found in Local Records at 11). Walker never responded to this letter. Def. SOF ¶ 39; Pl. SOF ¶ 12 ("Mr. Walker did not respond directly to Luna-Aloisio's January 27, 2017 letter because Raul Simons had previously told Mr. Walker to talk to Aetna[.]").

Nevertheless, on February 6, 2017, Walker filed a new (joint) FMLA and STD claim with Aetna,[6] listing an onset of disability of November 11, 2016 (the "2017 Joint Application"). JSOF ¶

---

with Simons involves Walker's conversations with Simons following Walker's receipt of the December 21 and 29 letters—which reflect only that "Mr. Walker would then speak with Raul Simons, convey that information, and Simons would be satisfied with that update." Walker Dep. at 55. *Second*, Walker cites a portion of his deposition that (for whatever reason) was *not* submitted—and, therefore, is *not* in evidence. *See* Walker Dep. at 80:18–81:08.

Thus, although Walker disputes Simons's recollection of their call, the Court need not construe this conflict in Walker's favor because a dispute that's unsupported by *any* evidence is *not* "genuine." *Anderson*, 477 U.S. at 248. Here, UPS has submitted *both* a sworn declaration, *see* Simons Decl., *and* a contemporaneous email, documenting the substance of the call, *see* Jan. 24 Email from Raul Simons to Olivera Luna-Aloisio (found in Local Records at 10). In response, Walker has nothing—not even a self-serving statement in his own deposition—for any contrary summary of that call. In any event, Walker does not dispute that he received the January 27 letter, which unambiguously informed him that he was on *unauthorized* leave. *See* Walker Dep. at 78. The dispute about whether Simons told him the very same thing on the January 24 call is, therefore, *neither* genuine *nor* material.

[6] Aetna took over FMLA administration on January 1, 2017 and opened a new file (with a different claim number) for Walker's 2017 Joint Application. *See* Hyde Decl. [ECF No. 53-14] ¶ 13. Aetna's Team Leader for the UPS account, Karen Hyde, testified that Aetna did not know about Walker's 2016 FMLA claim—filed with UPS—and had no practice of applying documentation submitted in support of one claim (his 2016 STD Application) to another claim. *See* Hyde Decl. ¶ 18 ("[W]e have no policy or practice of picking over prior claims to search for medical information that may or may not have anything to do with the disability or condition for which the employee is now seeking benefits. . . . Instead, Aetna evaluates each claim only with respect to the information submitted in connection with that claim, with the single exception for concurrently-filed STD and FMLA claims[.]").

31. [7] The next day, Aetna sent Walker information about how to submit his supporting documentation—including a Health Care Provider Certification form for his physician to complete. *Id.* ¶ 33; February 7, 2017 Letter (found in 2017 Aetna File [ECF No. 53-16] at 6). In that letter, Aetna told Walker that "this form can be very important too. You should fill out the first section and your doctor should fill out the rest. Then send the whole thing back to us by February 22, 2017." February 7, 2017 Letter (found in 2017 Aetna File [ECF No. 53-16] at 8). The blank FMLA certification noted that "[f]ailure to provide a complete and sufficient medical certification may result in a delay or denial of your FMLA request. 29 C.F.R. § 825.313." *Id.* at 10. That same day, Aetna helpfully sent Walker's new physician, Dr. Alan Gregg, a copy of the Behavior Health Clinician Statement for him to complete. *See* 2017 Aetna File at 16. In its cover letter to Dr. Gregg, Aetna noted that "[y]ou may have already received these forms via fax if your office is so equipped. If so, please disregard the enclosed forms." *Id.*

Although Walker claims to have sent "all my documentation that I had from my accident" and that "Dr. Gregg provided the rest of the information," *see* Walker Dep. at 65, Aetna has no record of either Walker or Dr. Gregg ever responding, *see* Def. SOF ¶ 46. Nor has Walker appended copies of

---

[7] At one point, Walker seems to deny ever requesting or filing a second FMLA request. *See* Walker Dep. [ECF 53-10] at 90 (Q: So see where it says Aetna Family Medical Leave Act Certification for Employee's Serious Health Condition. This letter asks you to take this to your doctor and have this completed to certify your continued FMLA leave. Did you understand that? A: No. Q: Did you do anything with this document? Did you give it to any of your doctors to be completed? A: I gave it to my attorney. I did not – this is a forgery. I did not request this."). This would be a damning admission, of course, because, if Walker never requested an FMLA certification (it goes without saying), he could not have submitted one—and his claim would fail on that basis. *See Howard v. Steris Corp.*, 886 F. Supp. 2d 1279, 1297 (M.D. Ala. 2012) (dismissing the plaintiff's FMLA claim because "he didn't request [FMLA leave] before a supervisor caught him snoozing" and fired him). At summary judgment, though, we must construe the evidence in Walker's favor. And, viewed charitably, it may be that Walker just didn't understand the question he was asked—which was whether, after he received the request for medical records in February 2017 from Aetna, he gave the medical certification form to his doctor. Either way, this testimony doesn't help Walker, much less create a genuine issue of material fact.

this "documentation" to any filing on this Docket. *See generally* Docket. Having not received any documentation, Aetna sent a follow-up letter on February 14, 2017, informing Walker that Aetna had no information from him and reminding him that, "if [Aetna] [didn't] get this information by [February 23, 2017], [Aetna] [wouldn't] be able to approve your leave request." February 14, 2017 Letter (found in 2017 Aetna File at 26). Even though Walker didn't respond to this letter either, Aetna gave him a seven-day "silent extension" for the FMLA portion of his 2017 Joint Application—"a courtesy, one neither required by law nor communicated to the employee"—to submit supporting documentation for his FMLA claim. Hyde Decl. ¶ 17.[8] When that seven-day window expired on March 2, 2017, Aetna administratively closed the FMLA portion of his 2017 Joint Application. *Id.* Aetna never notified Walker about the denial of the FMLA portion of his 2017 Joint Application. Pl. SOF ¶ 25.

On April 3, 2017, Luna-Aloisio sent Walker another letter that required him to submit medical paperwork—this time with a deadline of 5 p.m. on April 5, 2017. *See* April 3, 2017 Letter (found in Local Records at 12). This letter likewise warned Walker that his failure to respond would mean that "UPS would consider [him] to have resigned [his] employment with UPS." JSOF ¶ 35; April 3, 2017 Letter (found in Local Records at 12). In response, Walker retained a lawyer, warned UPS that he intended to sue, and sent UPS a preservation letter under Rule 34. *See* April 5, 2017 Letter (found in Local Records at 13–15). Walker's attorney also requested that UPS "please send [him] a specific list of what medical documentation you seek in response to your letter of April 3 so that I can formulate a proper response in a timely manner if appropriate." *Id.* The next day, April 6, 2017, UPS—through its new HR manager, Harry Wilson—terminated Walker for absenteeism. JSOF ¶ 38; *see also* Wilson

---

[8] Aetna separately denied the STD portion of Walker's 2017 Joint Application—in which he had claimed an onset date of November 11, 2016—because he had not filed his application within 60 days of onset, as required by UPS's STD plan. *See* February 23, 2017 Letter (found in 2017 Aetna File at 27). Aetna informed Walker of this denial in a letter dated February 23, 2017. *See id.*

Dep. [ECF No. 65-9] at 34 ("Q:[9] . . . Ryan Walker was fired specifically because of his failure to return to work by April 5th of 2017, and that's why he was fired on the following day? A: That's correct. Q: And that would be the sole basis in your mind for terminating Walker? A: Correct. Q: And you were the ultimate decision-maker that made that decision on that sole basis? A: Yes."); Wilson Decl. [ECF No. 53-13] ¶ 2 ("I previously worked as the Director of Human Resources for UPS's Florida District from January 2017 until January 2019."); id. ¶ 6 ("[T]he sole reason I terminated Mr. Walker was because he remained away from work on an unapproved leave of absence despite repeated requests that he provide supporting medical documentation.").

***

Walker later filed this lawsuit, alleging that (1) UPS fired him in retaliation for using FMLA leave in 2017 (Count I), and that (2) UPS interfered with his rights under the FMLA by wrongfully refusing his requests for FMLA leave, salary, and benefits (Count II). *See* Amended Compl. ¶¶ 37–52.

UPS moved for summary judgment on both counts, arguing that Walker never submitted the required documentation to support his request for FMLA leave. *See* UPS Motion for Summary Judgment ("UPS MSJ") [ECF No. 52]. Even if he had, though—UPS says—his FMLA claims would still fail because UPS terminated him only after he had taken *more* than 12 weeks of leave. *Id.* Since the FMLA only entitled him to those 12 weeks, UPS contends, his termination didn't prejudice his FMLA rights in any way. *Id.* UPS's MSJ is now ripe. *See* Walker Response [ECF No. 64]; UPS Reply [ECF No. 72]. Walker countered with his own motion for summary judgment, in which he says (in the main) that no one ever told him to come back to work. *See* Walker Motion for Summary Judgment ("Walker MSJ") [ECF No. 54]. Walker's MSJ, too, is now ripe for adjudication. *See* UPS Response [ECF No. 62]; Walker Reply [ECF No. 74].

---

[9] In Walker's version of the Wilson Deposition, the beginning of this question is omitted. No big deal: Wilson's answer is clear enough.

**STANDARD OF REVIEW**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3); *see also HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the

record" (quoting Fed. R. Civ. P. 56 advisory committee's note)). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In sum, then, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994))).

## THE LAW

The Family and Medical Leave Act of 1993 (the "FMLA"), 29 U.S.C. § 2601, *et seq.*, guarantees the rights of eligible employees to "12 workweeks of leave during any 12-month period." 29 U.S.C. § 2612(a)(1). The FMLA also ensures that any eligible employee who takes FMLA leave will be restored "to the position held by the employee when the leave commenced" or to "an equivalent position with equivalent employment, benefits, pay, and other terms and conditions of employment." § 2614(a)(1)(A)–(B).

An employee must initiate an FMLA request by providing notice to his or her employer. Employees must provide "at least thirty days advance notice" for foreseeable FMLA leave, *see* 29 C.F.R. § 825.302, and notice "as soon as practicable" for unforeseeable FMLA leave, *see* § 825.303. When requesting leave, the employee need not actually invoke the FMLA. *See Crawford v. City of Tampa*, 397 F. App'x 621, 623 (11th Cir. 2010). But he must "make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated time and duration of that leave." *Cruz v. Publix Super*

*Mkts., Inc.*, 428 F.3d 1379, 1382 (11th Cir. 2005). "Once an employee gives sufficient notice to her employer that potentially FMLA-qualifying leave is needed, the employer must then ascertain whether the employee's absence actually qualifies for FMLA protection." *Id.* at 1383. On receipt of an FMLA request, an employer must, within five days, tell the employee whether he is eligible for FMLA leave (what's known in the HR world as an "eligibility notice"). *See* § 825.300(b). FMLA-covered employers also have an ongoing statutory duty to provide a "rights and responsibilities notice" to all employees, "detailing specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations." § 825.300(c)(1).

Even if an employee is eligible for FMLA leave, an employer may require that employee to submit a certification that a specific leave request is covered by the FMLA. In doing so, "[a]n employer may require that a request for leave" for a serious health condition "be supported by a certification issued by the health care provider of the eligible employee[.]" § 2613(a). Such a certification must contain "(1) the date on which the serious health condition commenced; (2) the probable duration of the condition; (3) the appropriate medical facts within the knowledge of the health care provider regarding the condition;" and, for a serious health condition, (4) "a statement that the employee is unable to perform the functions of the position of the employee[.]" § 2613(b). Employers may also require an employee to get a second opinion (at the employer's expense), or even, if the first and second doctors' opinions conflict, a third. § 2613(c)–(d). In addition, the employer may demand that an employee submit a subsequent recertification on a "reasonable basis." § 2613(e). An employee "must provide the requested certification to the employer within 15 calendar days after the employer's request [absent extenuating circumstances]." § 825.305(b).

If asked, an employee must provide a "complete and sufficient" certification. § 825.305(c). "A certification is considered incomplete if the employer receives a certification, but one or more of the applicable entries have not been completed." *Id.* On the other hand, "[a] certification is considered

insufficient if the employer receives a complete certification, but the information provided is vague, ambiguous, or non-responsive." *Id.* If a certification is either incomplete or insufficient, the employer "shall state in writing what additional information is necessary to make the certification complete and sufficient" and must provide "seven calendar days to cure a deficiency." *Id.* "A certification that is not returned to the employer is not considered incomplete or insufficient, but constitutes a failure to provide certification." *Id.*

Unsurprisingly, an employer may deny an employee's FMLA request if the employee fails to return the required certification. For unforeseeable leave, "an employer may deny FMLA coverage for the requested leave if the employee fails to provide a certification within 15 calendar days from the receipt of the request for certification unless it is not practicable due to extenuating circumstances. . . . Absent such extenuating circumstances, if the employee fails to timely return the certification, the employer can deny FMLA protections for the leave following the expiration of the 15-day time period until a sufficient certification is provided." § 825.313(b). "If the employee never produces the certification, the leave is not FMLA leave." *Id.*

Employers are responsible "in all circumstances" for determining whether the employee's leave is FMLA-qualifying and for providing the employee with a "designation notice" of its decision. § 825.300(d)(1). "When the employer has enough information to determine whether the leave is being taken for a FMLA-qualifying reason (e.g., after receiving a certification), the employer must notify the employee whether the leave will be designated and will be counted as FMLA leave within five business days absent extenuating circumstances." *Id.* "If the employer determines that the leave will not be designated as FMLA-qualifying (e.g., if the leave is not for a reason covered by FMLA or the FMLA leave entitlement has been exhausted), the employer must notify the employee of that determination." *Id.*

14

The FMLA prohibits both interference with and retaliation for an employee's decision to take FMLA leave. § 2615(a)(1)–(2). To state a claim for interference, "a plaintiff must demonstrate that he was entitled, under the FMLA, to a benefit that he was denied." *Drago v. Jenne*, 453 F.3d 1301, 1306 (11th Cir. 2006). On the other hand, "to succeed on a retaliation claim, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." *Strickland v. WaterWorks and Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1207 (11th Cir. 2001). "In other words, a plaintiff bringing a retaliation claim faces the increased burden of showing that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *Id.*

FMLA "interference" encompasses a wide range of conduct. It, for instance, can include an employer's decision to terminate an employee after his leave request. *See Spakes v. Broward Cty. Sheriff's Off.*, 631 F.3d 1307, 1309–10 (11th Cir. 2011). An employer could also "interfere" with an employee's FMLA rights by failing to give him the required "employer-notice." § 825.300(e). But, to sustain an interference claim, an employee must suffer prejudice "by reason of the violation." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002); *see also id.* at 90 (holding that employees bear the burden of showing "real impairment of their rights and resulting prejudice").

Because the FMLA grants employees many different rights, a plaintiff asserting an FMLA-interference claim must identify the *specific* right (he says) was violated. *See White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1200 (11th Cir. 2015) ("The District Court was correct to hold that there was no basis for [the defendant] to have understood from the complaint that [the plaintiff] was alleging an employer-notice cause of action—i.e., that it failed to give notice to its employees about the FMLA as required under the Act. [The plaintiff's] complaint contains no mention of the notice (or lack thereof) given by [the defendant] to its employees, or the FMLA's employer-notice requirements."); *Frazier-White v. Gee*, 2015 WL 1648551, at *11 (M.D. Fla. Apr. 14, 2015) ("[The plaintiff's] third theory,

that [d]efendant interfered with her FMLA rights by failing to timely notify her of these rights, must also fail. Critically, as [d]efendants note, this theory is not fairly alleged anywhere in the Amended Complaint."), *aff'd* 818 F.3d 1249 (11th Cir. 2016).

**ANALYSIS**

## I.    Walker's MSJ as to Count II (Interference)

Walker advances a single argument for summary judgment—namely, that Aetna's failure to notify him of the denial of his request for FMLA leave violated 29 C.F.R. § 825.300(d)(1), and that he was prejudiced by this violation because, had he known about the denial, he would have returned to work. *See* Walker MSJ at 4–5; *see also id.* at 6 (citing Walker Decl. [ECF No. 56-1] ¶¶ 7–8 (asserting that, had he known of the denial, he "would have been able to use his leave differently knowing that he was not on FMLA leave and would have been able to return to work without being terminated")).

At first blush, Walker's position seems meritorious. After all, it's undisputed that, after Walker ignored Aetna's various requests for documentation, Aetna never formally told Walker that it had denied his FMLA request. *See* Hyde Dep. [ECF No. 56-3] at 3. Indeed, other than the February 7, 2017 letter requesting documentation and the February 14, 2017 follow-up letter warning that (without documentation) Aetna would be forced to deny his request, Aetna never contacted Walker again.[10] After that, there were no communications until April 3, 2017, when UPS (not Aetna) sent Walker a letter, informing him that, "if you fail to provide medical documentation supporting your absence by April 5, 2017 at 5:00 p.m. Eastern Standard [T]ime, we will consider you to have resigned your employment with UPS." April 3, 2017 Letter (found in Local Records at 12). When Walker failed to respond to this letter with medical documentation, he was terminated. JSOF ¶ 38.

---

[10] That said, as we've explained, Aetna *did* inform him of the denial of his second (2017) request for STD leave. *See* February 23, 2017 Letter (found in 2017 Aetna File at 27).

Unfortunately for Walker, his MSJ fails for two reasons. *First*, his "employer-notice" claim is untimely. *Second*, even if the claim were timely, he indisputably suffered no prejudice.[11]

### A.     Untimeliness

Let's start with UPS's first defense. The employer-notice claim appears nowhere in either the Original Complaint [ECF No. 1] or the operative Amended Complaint, *see* Amended Compl. ¶¶ 5–35. That's not because Walker was vague in his assertions or even because he didn't know how to advance a valid FMLA claim. To the contrary, his Amended Complaint very explicitly alleges that "UPS wrongfully interfered with Mr. Walker's FMLA benefits and wrongfully denied his entitlement to leave as provided under the FMLA," *see id.* ¶ 49, and that "UPS wrongfully denied Mr. Walker's entitlement to salary, time off work and benefits as provided under and protected by the FMLA," *id.* ¶ 50. Neither paragraph, of course, mentions employer-notice or even "notice" generally.

In similar circumstances, the Middle District of Florida (and later the Eleventh Circuit) concluded that an FMLA plaintiff's employer-notice claim was untimely. *See White v. Beltram Edge Tool Supply, Inc.*, 2014 WL 12617562 (M.D. Fla. Apr. 10, 2014), *aff'd in part, rev'd in part*, 789 F.3d 1188 (11th Cir. 2015). In *White*, the employer denied the plaintiff's request for FMLA leave and then terminated her employment. *Id.* at *2. In her response to the defendant's motion for summary judgment, the plaintiff argued, for the first time, that her employer had violated the FMLA's notice requirements by failing to advise and educate her about the contours of those requirements. *Id.* at *6. The district court refused to consider the plaintiff's (new) employer-notice claim because it "[was] not pled in [the plaintiff's] complaint." *Id.* The Eleventh Circuit affirmed that decision, reiterating that, while "a complaint must contain a short and plain statement of the claim showing that the pleader is entitled

---

[11] UPS also argues that Walker was not entitled to a designation notice. *See* UPS Response at 1–2. But, because we find that Walker's claim is untimely and that he suffered no prejudice, we need not decide whether he was entitled to notice in the first place.

to relief, . . . plaintiffs may not raise new claims at the summary judgment stage." *White*, 789 F.3d at 1200. Notably, the *White* complaint was *much* more expansive—which is to say, vague—than Walker's Amended Complaint is here. So, for instance, the *White* complaint did not identify the plaintiff's cause of action as either an "interference," "retaliation," or "employer-notice" claim. *Id.* Even so, in deciding which specific claims it asserted, the Eleventh Circuit noted that the complaint "contain[ed] no mention of the notice (or lack thereof) given by [the defendant] to its employees, or the FMLA's employer-notice requirements." *Id.* That omission was fatal to the plaintiff's claim. *Id.*[12]

Here, too, the Amended Complaint *never* mentions Aetna's failure to comply with FMLA's notice requirements. *See generally* Amended Complaint ¶¶ 1–35. Walker argues that his claim "is far from the new form of FMLA interference claim made by [the plaintiff in *White*] where the Court found that her failure to advise claim based on new allegations and new facts constituted a fundamental change in the nature of her FMLA claim." Reply at 3. But *White* is exactly on point. The *White* plaintiff's complaint did not label her cause of action as either an interference, retaliation, or employer-notice claim. *White*, 789 F.3d at 1200. Instead, she broadly alleged that her employer had improperly refused to designate her leave as FMLA leave. This was insufficient, the Eleventh Circuit concluded, to assert

---

[12] *White* is no outlier. *See, e.g.*, *Frazier-White*, 2015 WL 1648551, at *11 ("[The plaintiff's] third theory, that [d]efendant interfered with her FMLA rights by failing to timely notify her of these rights, must also fail. Critically, as [d]efendants note, this theory is not fairly alleged anywhere in the Amended Complaint."), *aff'd* 818 F.3d 1249 (11th Cir. 2016); *Hite v. Hill Dermaceuticals, Inc.*, 2014 WL 726566, at *13 (M.D. Fla. Feb. 25, 2014) ("Without analyzing whether [the defendant] has complied with the FMLA notice requirement, the Court finds that, even if such a private right of action did exist, any new cause of action [the plaintiff] may intend to raise at this juncture as a result of these perceived violations would be inappropriate, as [the plaintiff] neglected to allege any such violation in her Complaint."), *aff'd* 619 F. App'x 908 (11th Cir. 2015); *Shannon v. Nat'l R.R. Passenger Corp.*, 2018 WL 8221663, at *13 (S.D. Fla. June 27, 2018) ("Perhaps unsurprisingly, therefore, [the plaintiff] dedicates almost none of her argument to the issue of reinstatement. Instead, she creates a new theory of recovery—appearing for the first time in her motion for summary judgment—that her termination rendered her unable to exercise her seniority with her union."), *aff'd* 774 F. App'x 529 (11th Cir. 2019).

an employer-notice claim. *Id.* ("[T]here was no basis for [the employer] to have understood from the complaint that [the plaintiff] was alleging an employer-notice cause of action").[13]

Walker's notice claim is thus arguably *less* viable than Ms. White's was. In *White*, recall, the plaintiff tried to wiggle around the vague and generalized allegations she'd advanced in her complaint. *Id.* She insisted that her own failure to identify the specific FMLA right she was asserting permitted her, at summary judgment, to choose the right she then intended to pursue. *Id.* As we've said, Walker's notice claim fails because, like Ms. White's, his complaint never mentions employer notice as a potential cause of action. *See generally* Amended Complaint. But the point here is that Walker, unlike Ms. White, was quite specific about the rights he was hoping to vindicate in this case. He, in fact, properly labelled his two counts as advancing "interference" and "retaliation" claims, respectively. *Id.* ¶¶ 36–52. His new argument that those precisely designated counts somehow asserted a different cause of action—a cause of action that plainly appears nowhere in the Amended Complaint—is thus significantly weaker than the similar position the Eleventh Circuit rejected in *White*.

The proper method for advancing a new claim in federal court is, of course, to move the court for leave to *amend* the complaint—a motion this Court freely allows. But a plaintiff cannot spring a new claim or theory on a defendant at summary judgment. Nor can Walker justify his failure to seek leave in the circumstances presented here. The facts relating to the (purported) employer-notice claim, after all, were available to him *before* he filed this case. His decision (through counsel) to omit the claim from his complaint was, therefore, either purposeful or negligent. Either way, his employer-notice claim is untimely.

---

[13] In a portion of its decision that's not relevant here, the court reversed the district court's decision on the plaintiff's *retaliation* theory, reasoning that the plaintiff's allegation that the employer "terminated her for taking leave put [the employer] on notice that she was stating a retaliation cause of action." *White*, 789 F.3d at 1200 (cleaned up).

**B.      Lack of Prejudice**

Even if Walker's employer-notice claim were timely, it would still fail because he cannot show that the lack of notice prejudiced him. That is, he cannot establish that the lack of notice caused him to lose FMLA leave to which he was otherwise entitled. *See* UPS Response at 7–16. Nor can he point to some genuine issue of material fact with respect to whether, had he received notice, he would have returned to work. *Id.*

Again, Walker claims that he "would have been able to use his leave differently knowing that he was not on FMLA leave and would have been able to return to work without being terminated." Walker MSJ at 6. So, as an example, he says that he could have used disability leave, vacation leave, or some other form of leave. *Id.* But Walker has not alleged that he had any other such leave available to him. *See generally* Amended Complaint. Nor has he pointed to any *evidence* that he had any such leave. *See generally* Walker MSJ; Plaintiff's Statement of Facts in Support of Motion for Summary Judgment [ECF No. 55]. And it's well-settled that his unsupported argument in a summary-judgment brief is insufficient to survive summary judgment. *See, e.g., Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."); *English v. CSA Equipment Co., LLC*, 2006 WL 2456030, at *2 (S.D. Ala. Aug. 22, 2006) ("A summary judgment brief is not evidence; rather, it is simply the argument of counsel. In the overwhelming majority of cases, the proper judicial response to a factually unsupported or legally defective argument is simply not to credit it.").

Walker's reliance on *Brown v. Clayton County Board of Education*, 2017 WL 11084523 (N.D. Ga. Jan. 23, 2017), is misplaced. *Brown* involved a plaintiff who took leave under the Americans with Disabilities Act ("ADA") following a knee injury in December 2014. *Id.* at *2. In February 2015— "[a]fter [the] [p]laintiff had been on leave for well over a month"—his employer "notified him that he would be required to take FMLA leave and that all of that leave . . . would be designated as FMLA

leave, despite the fact that [the] [p]laintiff did not request FMLA leave." *Id.* The plaintiff, who worked as a "school resource officer," alleged that resource officers didn't need to work during the summer—and so, in May, he asked for permission to return in September. *Id.* The defendant (the school board) refused this request and required the plaintiff to return to school on May 6. When, by May 8, the plaintiff hadn't come back, the school fired him. *Id.* In his lawsuit, the plaintiff charged the school board with violating the FMLA, the ADA, and several other statutes. *Id.* at *1.

But, because the school board was the wrong defendant, the *Brown* Court granted the defendant's motion to dismiss. *Id.* at *4. The court then turned to the plaintiff's request for leave to amend, which the defendant opposed on the ground that any amendment would be futile. *Id.* As relevant here, the defendant contended that the plaintiff hadn't been injured because he had received the full 12 weeks of leave to which the FMLA entitled him. *Id.* The *Brown* Court rejected the school board's position and granted leave to amend, reasoning that the defendant's request was "premature" and better-suited for summary judgment—i.e., "after discovery had established that no harm could be maintained." *Id.* at *7. The court added that the defendant's failure to notify the plaintiff of the retroactive FMLA designation *might have* harmed him because, had the school board told him that his leave would be construed as FMLA leave, "he would have used his leave differently and he would have been able to return to work without being terminated (provided he was granted a reasonable accommodation provided under the ADA)." *Id.* at *8.

Our case is different in three main ways. *First*, we're at summary judgment—not, as *Brown* was, on a motion to dismiss. It's thus no longer sufficient for Walker to offer uncorroborated allegations, which (if plausible) the Court must accept as true. *Second*, we're here on Walker's MSJ, which places on his shoulders the burden of (1) establishing that he had other leave available and, if he did, (2) explaining *how* he would have used that leave. He has done neither. *See generally* Walker MSJ. *Third*, unlike Mr. Brown, Walker never received permission to take any other kind of leave (disability or

otherwise). His claim that he would have used his leave differently is thus entirely unsupported by the record.[14]

Even ignoring these dispositive deficiencies, however, there remains a genuine issue of material fact as to whether Walker would have been able (and willing) to return to work if UPS had notified him of the denial of his FMLA-leave request. On this issue, Walker points to only one piece of evidence: his own self-serving declaration, in which he attested that, "[h]ad I received notice that my 2017 FMLA claim was denied and for that reason I would be terminated by UPS for non-attendance at work, I would have returned to work or taken whatever actions were appropriate and legally necessary in order to remain a UPS employee." Walker Decl. ¶ 7.

But, in resolving *Walker's* MSJ, we must view the evidence in the light most favorable to UPS. *See Pennington*, 261 F.3d at 1265. And, as UPS notes, *see* UPS Response at 13–14, Walker doesn't explain *when* he would have come back to work and doesn't describe *what* other "actions" he would have "taken" to "remain a UPS employee." Indeed, in his deposition, Walker testified that, by April 2017— that is, *after* his 2017 allotment of 12 FMLA weeks had expired—he still would (at most) "have *probably* been *almost* ready to come back to work, yes." Walker Dep. at 112 (emphasis added). A reasonable jury could interpret this deposition testimony as contradicting the declaration's insistence that Walker was (definitely) ready to get back to work as of March 2, 2017 (when Aetna denied his request). The jury, in short, could reasonably conclude that, even as of April 2017, Walker wasn't ready to return. And that's critical because, by April 2017, Walker had been away from work for 14 weeks already. Wilson Decl. ¶ 6. Since the FMLA only affords employees 12 weeks of leave, *see* 29 U.S.C. § 2612(a)(1),

---

[14] We note, too, that Walker could not have used vacation days to bridge the gap. UPS's vacation leave doesn't carry over from year to year, and employees accrue leave only during months in which they actually work. *See* UPS Vacation Policy [ECF No. 53-4] at 2, 6. Because Walker did not work in 2017, he had accrued no vacation days. In any case, Walker never requested any vacation-benefit substitution to supplement and extend his FMLA leave. *See* Luna-Aloisio Decl. ¶ 18.

UPS could have fired him by late March 2017 with impunity, *see Dixon v. Pub. Health Tr. of Dade Cty.*, 567 F. App'x 822, 825–26 (11th Cir. 2014) ("So by December 18, 2011, [the plaintiff] had received the twelve workweeks of leave guaranteed by the FMLA. [The plaintiff] was fired three days later, which means none of her FMLA claims are viable. The district court therefore properly dismissed all four of them.") To put a finer point on it, if Walker wasn't ready to go in April 2017—by which time UPS could have fired him anyway—then it's hard to see how the lack of notice in March 2017 prejudiced him in any way. *See* 29 C.F.R. § 825.301(e) ("[I]f an employer that was put on notice that an employee needed FMLA leave failed to designate the leave properly, but the employee's own serious health condition prevented him or her from returning to work during that time period regardless of the designation, an employee may not be able to show that the employee suffered harm as a result of the employer's actions.").

***

Because Walker's MSJ advances an untimely theory of liability for which, in any event, there remain genuine disputes of material fact, his MSJ is **DENIED**.

## II.     UPS's MSJ (Counts I & II)

UPS has also moved for summary judgment on both counts. Because Walker's inference claim creates the basis for his retaliation claim, we resolve the interference claim first.

### A.     Count II: Interference

UPS argues that it couldn't have interfered with Walker's entitlement to FMLA leave because (1) it has a statutory right to request medical documentation, and (2) Walker never submitted adequate documentation. UPS MSJ at 6. And, UPS continues, even if Walker *were* entitled to FMLA leave, he was fired after he'd already taken 14 weeks off—which is more than the FMLA entitles him to. *Id.* at 7–8. As to this last point, UPS says that, to the extent it could have fired Walker with impunity after

23

week 12, Walker can show no prejudice from having been fired after week 14. *Cf. Dixon*, 567 F. App'x at 825–26.[15]

### 1.      The Documentation

There is no evidence that Walker *ever* submitted adequate documentation. This is especially true when it comes to his 2017 FMLA Application. To state a valid interference claim, "a plaintiff must demonstrate that he was entitled, under the FMLA, to a benefit that he was denied." *Drago*, 453 F.3d at 1306. In determining whether an employee's requested leave qualifies as FMLA leave, "[a]n employer may require that a request for leave" for a serious health condition[16] "be supported by a certification issued by the health care provider of the eligible employee[.]" § 2613(a). Such a certification must contain "(1) the date on which the serious health condition commenced; (2) the probable duration of the condition; (3) the appropriate medical facts within the knowledge of the health care provider regarding the condition;" and, for a serious health condition, (4) "a statement that the employee is unable to perform the functions of the position of the employee[.]" § 2613(b).

Recall that Walker initiated a new FMLA (and STD) claim with Aetna on February 6, 2017. JSOF ¶ 31. The following day, Aetna sent Walker a copy of the Health Care Provider Certification form. *Id.* ¶ 32. In doing so, Aetna warned Walker that "this form can be very important too. You should fill out the first section and your doctor should fill out the rest. Then send the whole thing back to us by February 22, 2017." February 7, 2017 Letter (found in 2017 Aetna File at 6). Aetna added that Walker's "[f]ailure to provide a complete and sufficient medical certification may result in

---

[15] UPS also points out that Walker never submitted any medical information to substantiate his 2016 FMLA Application. *See* UPS MSJ at 4–6. But, because UPS granted Walker all the 2016 FMLA leave to which he was entitled—and Walker never claims otherwise, *see* Amended Compl. ¶ 13—this argument is quite beside the point.

[16] While UPS contends in its Reply that Walker's conditions do not qualify as "serious," *see* Reply at 1, it didn't make this argument in its Motion and, therefore, has waived it. *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived.").

a delay or denial of your FMLA request. 29 C.F.R. § 825.313." *Id.* Walker did not return the form, so Aetna sent him a second letter on February 14, 2017, reminding him that, "[s]o far, we haven't received the information from your doctor to get your leave approved. . . . Keep in mind, if we don't get this information by that date, we won't be able to approve your leave request." February 14, 2017 Letter (found in 2017 Aetna File at 26). When Walker didn't respond to this second letter, Aetna graciously gave Walker another week to submit the documentation. *See* Hyde Decl. ¶ 17 ("Nevertheless, Aetna received no medical documentation from Mr. Walker or his physicians in connection with either his STD or FMLA claim. Aetna granted Walker a 'silent extension' . . . to submit the FMLA certification form, but never received it."). Still, despite three chances, Walker failed to respond. Walker, in sum, never submitted a certification in response to UPS's multiple, valid requests for medical documentation. UPS has thus carried its initial burden of showing that it did not interfere with Walker's right to FMLA leave because Walker never established that he was entitled to any such FMLA leave. *See Celotex Corp.*, 477 U.S. at 323.

At this stage, then, Walker must "come forward with specific facts showing there is a genuine issue for trial." *Bailey*, 284 F.3d at 1243 (cleaned up). But "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (quoting *Anderson*, 477 U.S. at 251)). Trying to meet this burden, Walker advances two arguments—both unavailing.

### a. Dispensing with Walker's Argument that he Submitted the Documentation

*First*, Walker contends that he did submit the required certification. In support, he points to four pieces of evidence. *One*, he offers the doctor's note from Holy Cross—dated November 21, 2016—which he submitted on December 1, 2016 in connection with his 2016 STD Application. *See*

Walker Response at 5. Even if such a note could satisfy the FMLA certification requirements,[17] Walker submitted this note to Aetna in support of his *2016 STD Application*—not, as relevant here, his *2017 FMLA application*. Nor could Walker plausibly offer this note as support for his 2017 FMLA Application because the note outlined a return-to-work date of December 6, 2016. *See* Work/School Status Note (found in 2016 Aetna File at 26). And it's undisputed that UPS designated the leave Walker took from November 10, 2016 through December 30, 2016—that is, far beyond December 6, 2016— as FMLA leave. JSOF ¶ 28. In any event (as the name implies), Walker didn't submit his 2017 FMLA Application until February of 2017, *see id.* ¶ 31—more than two months *after* the date on which, according to the 2016 note, he should have been back at work. As a matter of simple logic, then, the 2016 note could have nothing to do with—and lent no support for—the 2017 FMLA Application.

*Two*, Walker relies on the documentation Dr. Alan Gregg and Jamie Rubin submitted. *See* Walker Response at 5. Here, he contends that Dr. Gregg and Ms. Rubin completed and submitted the "Behavioral Health Clinician Statement required for the processing of the STD claim." *Id.* And, he adds, "both doctors supplemented the BHCS with detailed medical records, including evaluations, office notes, and treatment plans, all of which were sent to Aetna." *Id.* But Walker admits that he sent this information to Aetna—which, at the time, was administering *only* STD claims. JSOF ¶ 12. So, again—whether the documentation was valid or not—it was submitted in support of his 2016 STD

---

[17] A medical certification for FMLA leave must contain "(1) the date on which the serious health condition commenced; (2) the probable duration of the condition; (3) the appropriate medical facts within the knowledge of the health care provider regarding the condition;" and, for a serious health condition, (4) "a statement that the employee is unable to perform the functions of the position of the employee[.]" 29 U.S.C. § 2613(b). Walker's one-page note did not list a date of onset, did not include *any* information about the nature of his illness, and noted only that Walker could not perform "heavy lifting, carrying, pushing, [or] pulling" *until December 6, 2016*. Work/School Status Note (found in 2016 Aetna File at 26). It thus plainly failed to satisfy the statutory requirements—which was sufficient grounds for Aetna to reject it as inadequate.

Application, not his 2017 FMLA Application.[18] Aetna thus justifiably had these medical forms under a different claim number. JSOF ¶ 31.

Unfortunately, when he filed his 2017 FMLA Application, Walker never told Aetna about his 2016 STD request, and Aetna has no policy of "picking over prior claims to search for medical information that may or may not have anything to do with the disability or condition for which the employee is now seeking benefits . . . . Instead Aetna evaluates each claim with respect to the information submitted in connection with that claim, with a single exception for concurrently-filed STD and FMLA claims, like those Mr. Walker initiated in February 2017. Had Mr. Walker submitted medical information in the concurrent STD Claim initiated in 2017, those medicals could have been reviewed in support of his FMLA 2017 Claim." Hyde Decl. ¶18. Walker cites no case for his position that employers (or their third-party providers) have any obligation to dig through an employee's *previous* requests for *different* benefits to see if any page of that old package could be used to justify the new application. *See generally* Walker Response. Even if an employer had any such obligation, Walker's reliance on his 2016 documentation would still fail because the FMLA expressly allows employers to ask for a *second* round of certifications after a *second* FMLA request has been submitted. *See* 29 C.F.R.

---

[18] Walker's suggestion that this error should be excused (or imputed to Aetna) because Aetna didn't reach out to either clinician until December 22, 2017 (three days after Aetna's December 19, 2016 submission deadline) is, for three reasons, unpersuasive. *First*, it's undisputed that Walker didn't disclose the clinicians' identities in his initial November 2016 STD Application. After all, he only first saw Ms. Rubin (who is not a doctor) on Dec. 7 and Dr. Gregg on Dec. 22. *See* Walker Sealed Exhibits at 7, 14. According to the evidence in our record, Walker didn't tell Aetna about Dr. Gregg and Ms. Rubin until December 23, 2016 and January 6, 2017, respectively. *See* 2016 Aetna File at 30–31. Aetna thus cannot be faulted for failing to communicate *before* December 22, 2016 with two clinicians whose identities Walker himself had, as of that date, never disclosed. *Second*, Aetna *did* reach out to Dr. Alamo—the physician listed on Walker's 2016 STD Application—*three times* without any response. JSOF ¶¶ 20–21; Def. SOF ¶¶ 23–24. As a result of Dr. Alamo's non-responsiveness, Aetna informed Walker that it would thereafter be *his* responsibility to produce the required documentation. JSOF ¶ 22. Walker cannot now foist onto Aetna the burden of tracking down *his* doctors' information. *Third*, and in any event, Aetna ultimately did consider Walker's untimely documentation and reaffirmed its decision to deny his claim anyway. *See* January 21, 2017 Letter (found in 2017 Aetna File at 30–31).

§ 825.305(a) ("An employer may require that an employee's leave . . . due to the employee's own serious health condition that makes the employee unable to perform one or more of the essential functions of the employee's position, be supported by a certification issued by the health care provider of the employee . . . . An employer must give notice of a requirement for certification each time a certification is required[.]"); *see also* § 825.308(a) ("An employer may request recertification no more often than every 30 days and only in connection with an absence by the employee[.]").

Most importantly, Walker cannot show that the submissions from Dr. Gregg and Ms. Rubin satisfied the FMLA's certification requirements. Neither Dr. Gregg nor Ms. Rubin, after all, certified (1) that Walker could not work; (2) the date on which Walker became incapacitated; or (3) the date on which Walker could return to work. *See* Walker Sealed Exhibits at 3–6 (Gregg); *id.* at 7–16 (Rubin). These documents—from Dr. Gregg and Ms. Rubin—were thus inadequate to support Walker's 2017 FMLA Application.

*Three*, Walker claims that his own deposition establishes that he sent Aetna the requisite documentation in connection with his 2017 FMLA Application. *See* Response at 8 ("[Walker] and Dr. Gregg sent Aetna the same documentation."). The relevant portion of Walker's deposition went like this:

> Q: To your knowledge, what documentation did you need to provide to support your 2017 FMLA leave that said that you needed to be off of work?
>
> A: All my documentation that I had from my accident I provided then. Dr. Gregg provided the rest of the information.
>
> Q: And did that documentation specifically state that you needed to be off of work?
>
> A: Dr. Gregg's documentation, yes.
>
> Q: What about the documentation regarding your – the home invasion?
>
> A: All the documentation regarding the home invasion, all I had was the stuff from the hospital and the hospital doctors that I saw and I handed

28

> that to the HRSC and Aetna – HRSC via Aetna with the case number
> written on it, everything that I got from all four hospitals that I went
> to for the injury.
>
> Q:      So it's your testimony that you re-sent in this information in 2017?
>
> A:      That is correct.

Walker Dep. at 65.

Although this heave comes closer, it still misses the mark. Let's start with the easy ones. Walker cannot speculate about what Dr. Gregg did (or did not) send in. *See Gadsby v. Am. Golf Corp. of Cal.*, 557 F. App'x 837, 840 (11th Cir. 2014) ("We have said repeatedly that speculation about a fact or result is insufficient to survive summary judgment."); *Avenue CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013) ("[A]n inference based on speculation and conjecture is not reasonable."); *Shuler*, 441 F. App'x at 715 ("Speculation or conjecture cannot create a genuine issue of material fact."). For whatever reason, Walker elected not to introduce any evidence from Dr. Gregg— not a deposition, nor an affidavit, nor even a declaration setting forth his recollections.[19] Walker cannot substitute his own speculation for competent evidence.[20]

Nor can Walker testify about what "Dr. Gregg's documentation" included. The best evidence of what that documentation said, of course, would be the documentation itself. FED. R. EVID. 1002 ("An original writing, recording, or photograph is required in order to prove its content unless these

---

[19] In his Response, Walker appears to concede that Dr. Gregg sent Aetna no documentation at all. Indeed, he tries to excuse Dr. Gregg's failure to send in the required documentation by characterizing Aetna's letter to Dr. Gregg as confusing. *See* Walker Response at 9 ("This [letter] also made it appear to Dr. Gregg that he already received and returned these papers in connection with Mr. Walker's claims.") cleaned up)). The problem with this (perhaps alternative) argument is that there is no evidence of Dr. Gregg's confusion because, again, Walker elected not to submit Dr. Gregg's testimony.

[20] Of course, if Walker only "knows" that Dr. Gregg mailed the documentation because Dr. Gregg told him so, then that testimony would be likewise inadmissible here. *See Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) ("The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment[.]").

rules or a federal statute provides otherwise."); *cf. United States v. Henry*, 307 F. App'x 331, 336 (11th Cir. 2009) ("The purpose of the best evidence rule is to prevent inaccuracy and fraud when attempting to prove the contents of a writing." (cleaned up)). But, again, because no one—not Walker, nor UPS, nor Aetna—has any record of this (supposed) documentation, no such documentation has been added to the record. Walker, to be sure, *could have* circumvented the best evidence rule by showing that "the original has been lost or destroyed[.]" *Henry*, 307 F. App'x at 336; *see id.* ("[W]here the original has been lost or destroyed, the original is not required and other evidence of its content is admissible, unless the proponent lost or destroyed the original in bad faith."). Of course, he hasn't so much as gestured at any such argument—much less developed it with citations to authority. *See, e.g., Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."); *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions.").

But there's a bigger problem with Walker's testimony that he and Dr. Gregg submitted "all the documentation." Even if we accept this testimony—and even were we to allow Walker's musings about the substance of that documentation—Walker never suggests that the documents satisfied the FMLA's certification requirements. *See generally* Walker Response. So, for example, Walker never says that the documents set out the date of onset, that they outlined the nature of his illness, or that they included a return-to-work date. *Cf.* 29 U.S.C. § 2613(b). Without any evidence that the documents satisfied the FMLA's criteria, Walker's claim fails—even if he did submit "all the documentation."

*Four*, Walker says that he *must* have submitted the appropriate documentation because his request for FMLA leave was ultimately approved. *See* Walker Response at 10 ("[T]here is evidence

produced by UPS which shows that Mr. Walker and his medical professionals <u>did provide</u> the requested information and that <u>his claim was approved</u>.”). This argument is frivolous. In 2016, UPS (though it didn't need to) *conditionally* approved Walker's request for FMLA leave. *See* December 30, 2016 Letter (found in HRSC File at 25). But, after Aetna denied his 2016 STD Application, UPS made clear that Walker *was not on* FMLA leave. *Id.* The conditional approval thus proves nothing. For one thing, the 2016 leave was conditioned on Aetna's acceptance of Walker's 2016 STD claim—which, as we know, never came. JSOF ¶ 16. For another, the 2016 leave approval (conditional or otherwise) could have nothing to do with the 2017 FMLA Application—which, as we've already established, required Walker to submit *new* documentation. *See* 29 C.F.R. § 825.305(a).

Walker, in short, has failed to adduce any evidence—let alone "more than a scintilla of evidence"—to raise a genuine dispute of material fact with respect to the critical question presented here: whether he supported his 2017 FMLA Application with the required medical certifications.

### b.  Rejecting Walker's Alternative Position

*Second*—and in the alternative—Walker tries to excuse his failure to send Aetna the required certifications. Walker Response at 4–7. In support, he says that "HRSC informed Mr. Walker that it would <u>not</u> require the submission of independent medical information on the grounds that he would already be required to submit such to Aetna in connection with his STD claim." *Id.* at 4.[21]

This is silly. Walker was fired because he never submitted *any* documentation in connection with his 2017 FMLA request—not because he submitted that documentation to the wrong entity (e.g.,

---

[21] *See also id.* at 6 ("UPS Area Human Resources Manager Olivera Luna-Aloisio sent letters to Mr. Walker on December 21, 2016 and on December 29, 2016 advising him to contact Mr. Simons by telephone within 48 hours of receipt of the letters or UPS would take the position that he had abandoned his employment. In compliance with the instructions set forth in the letters, Mr. Walker contacted Mr. Simons who, in turn, advised him to contact Aetna." (cleaned up)); *id.* at 7 ("Even after UPS placed Mr. Walker on a personal leave of absence and requested medical certification be sent to HRSC, Mr. Walker was repeatedly told by his UPS manager to contact Aetna and, in turn, Aetna stated that it would contact the HRSC.").

to Aetna instead of UPS). Again, neither UPS nor Aetna (nor, for that matter, anyone else) has any record of the required certifications. For this reason alone, UPS's MSJ should be granted.

## 2.    No Prejudice

But, even if everything we've said thus far weren't true—even if Walker and his doctors had submitted all the appropriate FMLA certifications—Walker's claim would still fail because he suffered no prejudice to his FMLA rights.[22] UPS awards FMLA leave on a calendar-year basis. *See* UPS FMLA Policy [ECF No. 53-5] at 2. So, Walker was entitled, at most, to 12 weeks in 2016 (which he received) and 12 more weeks in 2017. *See id.* When he was fired on April 6, 2017, however, Walker had been absent for 14 weeks in 2017 alone—"well more than the time the FMLA would have allowed him to take." UPS MSJ at 6.

While the FMLA grants employees up to 12 workweeks of leave, it also "grants employers the right to require employees 'to substitute any of the accrued paid vacation leave, personal leave, or family leave of the employee for leave provided under the FMLA.'" *Dixon*, 567 F. App'x at 825–26 (quoting § 2612(d)(2)(B)). And the Eleventh Circuit has squarely held that, if the plaintiff "was terminated after she received twelve weeks of leave—be it paid or unpaid, personal or family, vacation or medical—none of her four FMLA claims are viable." *Id.* In so holding, the *Dixon* Court applied this rule strictly, noting that, "by December 18, 2011, [the plaintiff] had received the twelve workweeks of leave guaranteed by the FMLA. She was fired three days later, which means none of her FMLA claims are viable." *Id.*

---

[22] Walker briefly argues that he was injured because "his medical benefits were cancelled, his medical bills were not paid and he lost valuable vacation days." Walker Response at 13. Walker, however, wasn't entitled to vacation days at all. For (much) more on this, see n.14, *supra*. In any event, Walker's complaints about his medical benefits and bills are not in the complaint, and the law is pellucid that "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).

*Dixon* binds us here. Walker never returned to work in 2017 and, despite UPS's request that he return to work in April, he was still absent when he was fired on April 6, some 14 weeks into the year. He has thus suffered no prejudice. *See, e.g., Johnson v. Vintage Pharm.*, 185 F. App'x 798, 800 (11th Cir. 2006) (affirming judgment as a matter of law because, even though the "[p]laintiff was terminated for failure to present timely a FMLA medical form," it was an "undisputed fact that [p]laintiff's 12 workweek FMLA entitlement already was exhausted"); *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1268 (11th Cir. 2017) ("Relevant caselaw suggests that an employer does not interfere with an employee's right to reinstatement if that employee is terminated after taking leave in excess of the 12 weeks permitted by the FMLA."); *cf. McGregor v. Autozone, Inc.*, 180 F.3d 1305, 1308 (11th Cir. 1999) (rejecting an FMLA reinstatement claim "[b]ecause defendant exercised its statutory right to require plaintiff to substitute her accrued paid leave for her 12 week FMLA leave, 29 U.S.C. § 2612(d)(2)(B), and plaintiff was absent for more than the protected period of time, she did not have a right to be restored to her prior or similar position").[23] The rule is simple: the FMLA protects only 12 weeks away from work per year. If you're gone longer, your subsequent FMLA claim is unviable.

Walker tries to parry this conclusion by relying on a Third Circuit case, *Lupyan v. Corinthian Colls., Inc.*, 761 F.3d 314 (3d Cir. 2014).[24] In *Lupyan*, the Third Circuit reversed the district court's order

---

[23] *See also, e.g., Barnes v. Ethan Allen, Inc.*, 356 F. Supp. 2d 1306, 1311 (S.D. Fla. 2005) ("Since the record is clear that [p]laintiff was on paid [short term disability] leave for about seven weeks and did not suffer any adverse employment action until after at least another five weeks, summary judgment is appropriate for [d]efendants if the claim is one for interference with FMLA rights, since [p]laintiff received more than twelve weeks of leave."); *Armbrust v. SA–ENC Operator Holdings, LLC*, 2015 WL 3465760, at *5 (M.D. Fla. June 1, 2015) (holding that an employee had no viable interference claim when "he was given the full twelve (12) weeks under the FMLA and his termination occurred after his FMLA leave expired"); *Morehardt v. Spirit Airlines, Inc.*, 174 F. Supp. 2d 1272, 1278 (M.D. Fla. 2001) ("Plaintiff originally took leave in April 1998 to help her stepdaughter with her new baby and then beginning in late June 1998 she was out on leave for five more months because of an injury to her eye. This period was well in excess of the 12 week period provided for under the FMLA.").

[24] It's true, as UPS says, that the sentence Walker has picked from *Lupyan* refers to a retaliation claim. *See* UPS Reply at 7–8. But that's no problem because Walker is right that *Lupyan* applies the same standard to interference claims. *See Lupyan*, 761 F.3d at 323.

granting the defendant's motion for summary judgment on an FMLA-interference claim because, even though "[the employee] received all of the leave she was entitled to under the FMLA . . . [she contended that], had she known her leave fell under the FMLA, she would have expedited her return and rejoined [the employer] before she exhausted her twelve weeks of leave and was effectively terminated. If accepted by a jury, that would be sufficient to establish the required prejudice under the FMLA." *Lupyan*, 761 F.3d at 324. In the Third Circuit's view, the plaintiff's testimony that "she could have returned to work within twelve weeks had she known her job was in jeopardy[] must also be weighed by the factfinder." *Id.*

As we've seen, *Lupyan* conflicts with binding Eleventh Circuit precedent—which is reason enough to disregard it. Even so, *Lupyan* differs from our case in at least one salient way: The employee in *Lupyan* didn't know that she had to return in 12 weeks (or face termination) because she didn't know that she was on FMLA leave in the first place. Viewed in this context, *Lupyan*'s holding makes sense. After all, if she didn't know she was on a 12-week timer, how can we punish her for failing to come back when the 12 weeks were up? Walker, by contrast, was told—multiple times—that he had to come back to work or face termination. *See* December 30, 2017 Letter (found in HRSC File at 24); Simons Decl. ¶ 5; January 27, 2017 Letter (found in Local Records at 11); February 7, 2017 Letter (found in 2017 Aetna File at 6); February 14, 2017 Letter (found in 2017 Aetna File at 26); April 3, 2017 Letter (found in Local Records at 12). And so, we can safely discredit Walker's self-serving statement that, "[h]ad I received notice that my 2017 FMLA claim was denied and for that reason I would be terminated by UPS for non-attendance at work, I would have returned to work or taken whatever actions were appropriate and legally necessary in order to remain a UPS employee," *see* Walker Decl. ¶ 7, because we know that, after UPS denied his requests, he *didn't* come back to work. Quite the opposite: after receiving unambiguous admonitions from UPS on December 30, 2016, January 24, 2017, and January 27, 2017, Walker, it's undisputed, *stayed home.* And, when UPS sent a

final letter seeking documentation on April 3, 2017, Walker—instead of returning to work—hired a lawyer and threatened to sue. *See* April 5, 2017 Letter (found in Local Records at 13–15). Our case is thus nothing like *Lupyan*.

***

No reasonable jury, in short, could conclude *either* that Walker submitted the required certification to UPS (or to Aetna) *or* that, even if he had, Aetna's[25] denial of his FMLA request prejudiced his FMLA rights. UPS's MSJ on Count II is, therefore, **GRANTED**.

### C.    Count I (Retaliation)

Walker's retaliation claim fails because he cannot show that he engaged in FMLA-protected conduct and because, even if he could, he cannot establish that UPS's legitimate rationale for terminating him was pretextual. "To prove FMLA retaliation, an employee must show that his employer *intentionally* discriminated against him for exercising an FMLA right. Unlike an interference claim, an employee 'bringing a retaliation claim faces the increased burden of showing that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus.'" *Martin v. Brevard Cty. Pub. Sch.*, 543 F.3d 1261, 1267–68 (11th Cir. 2008) (quoting *Strickland*, 239 F.3d at 1207). "Absent direct evidence of retaliatory intent," courts apply the "burden-shifting framework established in *McDonnell Douglas Corp. v. Green*[.]" *Id.* at 1268 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under the *McDonnell Douglas* test, "an employee claiming FMLA retaliation must show that (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment decision, and (3) the decision was causally related to the protected activity." *Id.* "Once an employee establishes a *prima facie* case of retaliation, the burden shifts to the employer to articulate a legitimate reason for the adverse action." *Id.* (cleaned up). If the employer advances a "legitimate reason," the

---

[25] (or UPS's).

burden shifts back to the employee to show that "the employer's proffered reason was pretextual by presenting evidence 'sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Id.* (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)).

UPS contends that, for two reasons, Walker has failed to make out a prima facie case of retaliation. *First*, UPS says that Walker engaged in no statutorily protected activity because he "never submitted medical documentation demonstrating his entitlement to the FMLA's protections[.]" UPS MSJ at 11. *Second*, UPS maintains that, even if Walker had submitted the appropriate documentation, he cannot show prejudice to his FMLA rights because he took more than 12 weeks of leave. *Id.* at 11.[26] We agree.

Strangely, Walker doesn't address the first argument at all—other than to regurgitate his employer-notice contentions, *see* Walker Response at 15, which we've already rejected. Walker has thus failed to meet his burden of showing that he engaged in statutorily protected conduct. *See Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) ("[A] party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed.").[27]

---

[26] UPS wisely doesn't disagree that Walker has suffered an adverse employment decision. *See generally* UPS MSJ.

[27] Walker could have argued that the act of *requesting* FMLA leave is protected conduct. *See Pereda v. Brookdale Senior Living Cmtys., Inc.*, 666 F.3d 1268, 1276 (11th Cir. 2012) ("Under the FMLA an employee need not be currently exercising her rights or currently eligible for FMLA leave in order to be protected from retaliation."). And, if Walker had been fired after he asked for FMLA leave in February 2017, he might have had a point. But that's not what happened. Walker's last day of work was November 10, 2016. JSOF ¶ 7. On December 30, 2016, UPS told Walker that he was *not* on FMLA leave. JSOF ¶¶ 27–28. Still, he never returned to work. *Id.* A month later, UPS told Walker that he needed to come back to work. *See* January 27, 2017 Letter (found in HRSC File at 25). Walker didn't. And he never responds to UPS's argument that the FMLA doesn't protect his right to stay home for more than a month *after* his FMLA request has been denied. *See generally* Walker Response. Nor could he. *See Cash v. Smith*, 231 F.3d 1301, 1307 (11th Cir. 2000) ("Cash has failed to present evidence that she exercised a protected right under the FMLA. APCO requested that Cash have her doctor complete the company's standard FMLA certification form . . . . Cash did not provide APCO

Even if we assume that Walker's conduct was statutorily protected, UPS has articulated a legitimate, non-retaliatory reason for his firing—"namely, a good faith (and accurate) belief that Walker had violated UPS's attendance guidelines by remaining away from work long after UPS informed him his absences were unexcused." UPS MSJ at 11; *see also* Wilson Dep. at 34 ("Q: . . . Ryan Walker was fired specifically because of his failure to return to work by April 5th of 2017, and that's why he was fired on the following day? A: That's correct. Q: And that would be the sole basis in your mind for terminating Walker? A: Correct. Q: And you were the ultimate decision-maker that made that decision on that sole basis? A: Yes."); Wilson Decl. ¶ 2 ("I previously worked as the Director of Human Resources for UPS's Florida District from January 2017 until January 2019."); *id.* ¶ 6 ("[T]he sole reason I terminated Mr. Walker was because he remained away from work on an unapproved leave of absence despite repeated requests that he provide supporting medical documentation.").

Walker answers that "UPS did not have a good-faith belief that Mr. Walker had violated the UPS attendance guidelines . . . because UPS was forced to admit it <u>never</u> provided Mr. Walker with the statutorily required noticed [sic] that his request for FMLA leave was denied." Walker Response at 15. But we've already rejected Walker's employer-notice theory of liability. Even if that theory were viable, however, it wouldn't undermine UPS's legitimate, non-discriminatory motivation for firing him. UPS has submitted evidence for its position that it fired Walker because he stopped coming to work and because he never submitted the required FMLA documentation—despite at least three unambiguous requests that he do so (on February 7, 2017, February 14, 2017, and April 3, 2017). And, indeed, when Walker was told one final time to submit that documentation or return to work, he hired a lawyer and threatened to sue. This evidence is more than sufficient to shift back to Walker the burden of establishing that UPS's proffered reason is pretextual.

---

with certification that her medical conditions met the statutory standard, and therefore the medical leave that she did take was not under the auspices of the FMLA.").

To meet this burden, Walker advances four arguments—all unpersuasive. *First*, he says that "the close temporal proximity between an employee's request for FMLA and the termination of his or her employment constitutes sufficient circumstantial evidence to create a genuine issue of material fact as to causation." Walker Response at 17. In saying so, Walker ignores our facts. UPS did not, as Walker suggests, terminate him soon after he requested FMLA leave in 2016. Instead, as we've detailed, they granted him FMLA leave *even though* he unquestionably failed to submit the appropriate documentation. They then spent several *months* politely asking him for that documentation, following up with explanatory letters, and (needlessly) giving him some magnanimous extensions—all in the face of Walker's consistent stonewalling. It wasn't until April of 2017—after Walker had disregarded every request for documentation and blown through multiple deadlines—that UPS (finally) fired him. This hardly qualifies as "close temporal proximity."

*Second*, Walker "to this day believes that his termination by UPS was based on the racial animus which existed against him as exemplified through the continual harassing interactions he had with [his former direct supervisor] Michael Alberni." Walker Response at 16. Here, Walker proves both too little and too much. Starting with too little: the racial animus allegation appears nowhere in the Amended Complaint—which is reason enough to ignore it. *See Gilmour*, 382 F.3d at 1315 ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."). And it's blackletter law that a plaintiff's "belief"—what others might call speculation—isn't, standing alone, sufficient to survive a properly supported motion for summary judgment. *Dugandzic v. Nike*, 807 F. App'x 971, 977 (11th Cir. 2020) (holding that the plaintiff's "assertion" (read: belief) that "the investigation of his complaints was flawed . . . . presents a mere *scintilla* of evidence of bias, which is insufficient"); *cf. Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("[T]he inquiry into pretext centers on the employer's beliefs, not the employee's[.]"). Now, for too much: the

degree of UPS's (perceived) racial animus is wholly irrelevant to the only question at issue here: whether UPS fired Walker because he requested FMLA leave.[28]

*Third*, Walker argues that his termination was retaliatory because UPS allowed other employees to return to work "even if they had previously been absent from UPS during the period of time that UPS was evaluating the request for leave." Walker Response at 15 (citing Wilson Dep. at 45 ("A: Because they may have medical documentation that substantiates the leave, but it may not be sufficient for HRSC to approve the leave. Q: And in that case what would the person's fate be as a UPS employee? A: In the case where they asked for leave, took leave, but wasn't granted the leave? Q: Yes. A: And came back to work? Q: Yes. A: They just come back to work.")). But, as we've seen, Walker *was* given the very same opportunity to come back to work. He just decided not to. He didn't come back when he was told to in December 2016, *see* December 30, 2016 Letter (found in HRSC File at 25); he didn't come back when he was *twice* instructed to return in January, *see* Simons Decl. ¶ 5; January 27, 2017 Letter (found in Local Records at 11); and he didn't come back in April (when he received UPS's final letter), *see* April 3, 2017 Letter (found in Local Records at 12). Walker was thus treated no differently than anyone else.

---

[28] In any case, Walker's evidence of racial animus is strained and sparse. Walker has some text messages from Alberni (his former boss) that contain racial epithets and an email string—no epithets—between several UPS local HR personnel, which discusses Walker's 2016 FMLA Application. Alberni was copied on this email string—though he did not author or respond to any of the messages, the last of which was sent on February 24, 2017. *See* Exhibit B [ECF No. 65-10] at 18–23. Walker's claim, then, is that, because Alberni was a racist, he injected himself into the HR conversation in the hopes of coercing HR to deny Walker's FMLA claim. But, as Walker well knows, business managers (like Walker and Alberni) had no control over FMLA claims when UPS administered them in 2016—and even less so when Aetna handled them in 2017. *See* Walker Dep. at 32 ("Q: As a business manager, you didn't have any authority over whether an employee's FMLA was granted or denied, did you? A: No, I did not."). And there's absolutely no evidence that, protocol aside, Alberni had anything to do with HR's decision on Walker's request. Alberni did not, for instance, author or respond to any of the emails—which, in any event, didn't relate to Walker's 2017 FMLA Application.

*Fourth*, Walker says that he "reasonably believed that he was on FMLA leave at the time, otherwise why would UPS still be asking for his FMLA medical documentation, as confirmed by its last letter." Walker Response at 17. We need not quarrel with Walker about the reasonableness of this "belief" because Walker's subjective belief is—reasonable or not—entirely irrelevant to our inquiry, which asks only whether <u>UPS</u> fired him *because* he requested FMLA leave. *See Martin*, 543 F.3d at 1267 ("Unlike an interference claim, an employee bringing a retaliation claim faces the increased burden of showing that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus.").[29]

Having thus rejected Walker's arguments, this Court now **GRANTS** UPS's MSJ as to Count I.

\*\*\*

No reasonable jury could conclude either that UPS interfered with Walker's exercise of his FMLA rights or that it retaliated against him for trying to do so. Accordingly, and after careful review, the Court hereby **ORDERS AND ADJUDGES** as follows:

1. The Defendant's Motion for Summary Judgment [ECF No. 52] is **GRANTED**.

2. The Plaintiff's Motion for Summary Judgment [ECF No. 54] is **DENIED**.

3. The Clerk shall **CLOSE** this case.

4. Pursuant to Rule 58, the Court will enter an order of final judgment separately.

5. All other pending motions are **DENIED as moot**, all hearings are **CANCELLED**, and any deadlines are **TERMINATED**.

---

[29] Walker's belief is plainly unreasonable in any case. UPS and Aetna repeatedly told him that his requests for FMLA leave could *not* be approved precisely because he'd consistently failed to support those requests with the necessary certifications. Walker's rhetorical question—"why would UPS still be asking for his FMLA medical documentation, as confirmed by its last letter," Walker Response at 17—thus answers itself: *because they could not approve you for FMLA leave until you submitted the appropriate documentation*.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 19th day of March 2021.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record